**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 17-CR-20054-MARTINEZ/GOODMAN**

UNITED STATES OF AMERICA

v.

JOHN HOLLAND,

    Defendant.

_____/

**ORDER ON MOTION TO TRANSFER VENUE**
**TO THE NORTHERN DISTRICT OF GEORGIA**

In the world of real estate, it is often said that the success of a particular transaction depends on three things: location, location, location. In federal criminal prosecutions, location may have an impact on the case, but, unlike a real estate-related event, something *can* be done about the location. But a decision about changing the location of a criminal prosecution from a venue where a case was properly filed to another location also depends on three things: discretion, discretion, discretion.

In the instant case, Defendant John Holland ("Defendant" or "Holland"), a Dallas, Texas resident, has moved to transfer venue of this criminal prosecution to the Northern District of Georgia (i.e., Atlanta). Although the United States *could* have obtained a federal grand jury indictment in Atlanta, it chose to seek an indictment in the Southern District of Florida (i.e., Miami). The issue raised by Holland's motion [ECF

1

No. 20] is whether the Court here should exercise its discretion and order a change of venue to the Northern District of Georgia.

Federal Rule of Criminal Procedure 21(b) provides the authority for a transfer "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). When evaluating a Rule 21(b) motion, courts generally consider the factors established in *Platt v. Minnesota Mining and Manufacturing Co.*, 376 U.S. 240 (1964) ("*Platt* factors"). The United States submitted a response opposing the motion to transfer venue and Holland filed a reply. [ECF Nos. 31; 32].

After reviewing the submissions and considering the *Platt* factors, the Undersigned **denies** the motion. At bottom, Holland has not met his burden to demonstrate a substantial imbalance of inconvenience. As explained below, many of the relevant *Platt* factors are neutral, with each side advancing some legitimate points, leaving the analytical balance scale largely in the middle, without tilting significantly to one side.

## Factual Background

Not surprisingly, the parties present dramatically different views of the facts. In an effort to provide a balanced perspective, this Order will focus first on the actual charges in the indictment, presenting the facts as portrayed by the Government and outlining the specific charges. The factual overview will then explain how Holland views the case.

The Government's version of the facts will highlight those events occurring in South Florida and will, when appropriate, emphasize circumstances arising from outside of Georgia, where Holland wants the case to be transferred. The section outlining Holland's version will underscore the scenarios occurring in Georgia.

## A.    The Government's Version of the Facts

Holland has resided in Dallas, Texas for 11 years. Holland's home in Dallas, *Texas* serves as his *primary* residence. Holland also maintains a second residence in Park City, *Utah.*

From Spring 2006 through Fall 2013, Holland was the Senior Vice President of Operations at Tenet Healthcare Corporation ("Tenet"). Tenet was, and is, a Fortune 200 company that owned and operated more than 70 for-profit hospitals operating in at least 10 states throughout the United States, with **12 of its hospitals** operating **in the Southern District of Florida.** During his tenure as the Senior Vice President at Tenet, Holland worked from Tenet's corporate headquarters in Dallas, *Texas* and oversaw Tenet hospitals throughout the Southeastern United States.

On January 24, 2017, Holland was indicted for his leading role in an over $400 million criminal fraud scheme at Tenet. [ECF No. 1] ("Indictment"). The indictment charged Holland with mail fraud (Count 1); health care fraud (Count 2); and major fraud against the United States (Counts 3-4).

The scheme alleged in the indictment was a fraud of national reach and significance, directly covering 7 states and districts (**Florida,** Texas, South Carolina, Georgia, Pennsylvania, California, and the District of Columbia) and jeopardizing the continued viability of Tenet, the publicly traded company, and its more than 70 hospitals operating across the United States, including its 12 hospitals in **South Florida.**

The criminal fraud and bribery scheme was furthered (a) by Holland's failure to disclose material information to representatives of the Government (i.e., a federal monitor who was located in **Miami Lakes, Florida**) and (b) through certain affirmative false representations he made and caused to be made to the Government (through submissions to the federal monitor in **Miami Lakes, Florida).**

Holland's material misrepresentations and omissions related to his knowledge and awareness that bribes and kickbacks were being paid and caused to be paid, by him and others, to the owners and operators of a pre-natal clinic, such as Clinica. These bribes and kickbacks were allegedly meant to induce them to refer their patients to, and arrange for their patients to receive services from, certain Tenet hospitals in the Southeastern United States. Specifically, the indictment alleges that Holland:

- Paid and caused to be paid bribes and kickbacks for Medicaid patient referrals [Indictment, p. 10];

- Concealed the bribery scheme through the creation of pretextual contracts [Indictment, p. 11];

- Circumvented and caused to be circumvented Tenet's internal accounting controls to facilitate the bribe payments [Indictment, p. 11];

- Falsified the books and records of Tenet to conceal the true nature and extent of the unlawful bribery scheme [Indictment, pp. 12-13];

- Made and caused to be materially false, fraudulent, and misleading representations and omissions to the Government [Indictment, p. 13];

- Made and caused to be made, through his co-conspirators, false statements and representations to individual patients to ensure that these patients delivered their newborns at Tenet hospitals [Indictment, p. 13];

- Caused Tenet to fraudulently bill the Government (through state Medicaid programs and the Medicare program) at least $400 million and fraudulently receive at least $127 million [Indictment, p. 14]; and

- Caused, by failing to disclose the bribery, kickback, and fraud schemes to the Government, Tenet and its subsidiaries to receive more than $10 billion in monies from federal health care programs -- monies to which Tenet may well not have been entitled [Indictment, p. 14].

The materially false and fraudulent statements and omissions Holland made, and caused to be made, to the federal monitor in *Miami*, Florida grew out of Tenet's 2006 resolution with the Government and a corporate integrity agreement ("CIA") executed between Tenet and the Department of Health and Human Services, Offices of Inspector General ("HHS-OIG"). To place in context the critical importance the CIA played in the fraud and bribery schemes and the specific offenses charged, more than

5

two pages of the indictment are devoted to explaining critical aspects of Tenet's agreement with the Government. [Indictment, pp. 7-9].

Specifically, in 2006, Tenet entered into a civil settlement agreement with the United States. [Indictment, p. 7]. As part of the civil settlement agreement, Tenet paid the Government $900 million to resolve allegations of fraud and the payment of bribes and kickbacks, among other things. In connection with this resolution, Tenet executed a CIA with HHS-OIG. [Indictment, p. 7,; ECF No. 31, p. 4]. Through its execution of the CIA, HHS-OIG expressly promised not to exclude Tenet from participating in, and billing and receiving payment from, federal health care programs (including Medicare and Medicaid) in exchange for certain promises and representations from Tenet. [Indictment, p. 7; ECF No. 31, p. 4].

One promise that Tenet made in the CIA was that it would report to HHS-OIG all "Reportable Events." A Reportable Event was defined in the CIA as a matter "that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized." [Indictment, p. 8]. Tenet employees, such as Holland, were required to report such matters internally at Tenet so that the matters then could be properly reported by Tenet to the federal monitor overseeing Tenet's compliance with the terms of the CIA.

In addition, Holland, as Senior Vice President of Operations at Tenet, was required to affirmatively certify, on an annual basis and directly to the federal monitor, that: "[t]o the best of my knowledge, except as otherwise described in the applicable report, Tenet is in compliance with the requirements of the Federal health care program requirements and the obligations of this CIA." [Indictment, p. 8]. These certifications were referred to as "Senior Corporate Management" certifications. In the event Tenet failed to disclose a Reportable Event to HHS-OIG or engaged in a repeated or flagrant violation of Tenet's obligations under the CIA (which included the obligation not to pay bribes and kickbacks), HHS-OIG could elect to initiate proceedings to exclude Tenet and its subsidiaries from participating in federal health care programs, including Medicare and Medicaid.

In the event Tenet and its subsidiaries were excluded, all of its subsidiaries, including the 12 hospitals located in **South Florida**, would be unable to receive monies from Medicare and Medicaid.

From 2009 to 2012, Tenet's CIA was principally overseen and administered by a federal monitor employed by HHS-OIG and who worked in HHS-OIG's Miami Regional Office located in **Miami Lakes, Florida**. From 2009 to 2012, the federal monitor in Miami Lakes received thousands of pages of documents and dozens of mailings, emails, and telephone calls from Tenet relating to Tenet's compliance with the terms of the CIA. These communications from Tenet required the federal monitor to perform

countless hours of work reviewing, analyzing, investigating, and responding to issues arising from Tenet's CIA.

These mailings, electronic communications, and telephone calls included, among other things: (1) disclosures of Reportable Events; (2) Tenet's annual reports to the Government; and (3) Senior Corporate Management Certifications from Tenet's corporate executives which included, critically, Holland.

At all times, the federal monitor located in **Miami Lakes** relied on the accuracy of the information transmitted by Tenet and the completeness of the disclosures received from Tenet's senior corporate management, including Holland. Yet, at no time did the federal monitor receive any disclosure from Holland or any Tenet employee, in the Southern District of Florida or any other jurisdiction, identifying the unlawful referral relationship referenced in the Indictment.

From at least 2006 to 2013, Tenet maintained a **billing center in Boca Raton, Florida** to assist with the processing and payment of Medicare and Medicaid claims for Tenet hospitals located in the southeastern United States and in Pennsylvania. [ECF No. 31, p. 6]. At various times, the billing center existed as Tenet's "National Medicare and Medicaid Center." [ECF No. 31, p. 6].

From 2007 to 2013, more than **7,000** patient claims were processed by the National Medicare and Medicaid Center and its successor entity, **in the Southern District of Florida,** for patients who were unlawfully referred as a result of Holland's

scheme to defraud. [ECF No. 31, p. 6]. The National Medicare and Medicaid Center processed claims for Tenet hospitals located in Pennsylvania, Georgia, South Carolina, and Florida, including Tenet's 12 hospitals located in South Florida -- claims that would not have been properly submitted and paid had Tenet been excluded by the Government from participating in the Medicare and Medicaid programs. [ECF No. 31, p. 6].

Count One charges Holland with mail fraud, in violation of 18 U.S.C. § 1341. The mailing that is charged is a Federal Express package mailed from Tenet's Dallas, Texas corporate headquarters and delivered on or about January 26, 2012 to HHS-OIG's offices, in **Miami Lakes, Florida**, where the federal monitor worked. [ECF No. 31, p. 6]. The mailing contained Tenet's annual report for the preceding year. [ECF No. 31, p. 6]. **At no time did the mailing travel through the state of Georgia, much less the Northern District of Georgia.** [ECF No. 31, p. 6].

Count Two charges Holland with health care fraud, in violation of 18 U.S.C. § 1347(a)(2). This charge is based on the materially false, fraudulent, and misleading statements and omissions contained in Tenet's 2011 annual report to HHS-OIG. [ECF No. 31, p. 7]. The annual report was sent via Federal Express from Tenet's corporate headquarters in Dallas, Texas and received by HHS-OIG and the federal monitor on or about January 26, 2012, **in Miami Lakes, Florida**. [ECF No. 31, p. 7]. **At no time did the**

annual report charged in Count Two travel through the state of Georgia, much less the Northern District of Georgia. [ECF No. 31, p. 7].

Counts Three and Four charge Holland with major fraud against the Government, in violation of 18 U.S.C. § 1031. These charges are based on the materially false, fraudulent, and misleading statements and omissions contained in Tenet's 2009 and 2010 annual reports to HHS-OIG. [ECF No. 31, p. 7] The annual reports were sent via Federal Express from Tenet's corporate headquarters in Dallas, Texas and received by HHS-OIG and the federal monitor on or about January 27, 2010 and January 27, 2011 in **Miami Lakes, Florida**. [ECF No. 31, p. 7]. **At no time did the annual reports charged in Counts Three and Four travel through the state of Georgia, much less the Northern District of Georgia.** [ECF No. 31, p. 7].

**B.      Holland's Version of the Facts**

Tenet is a Nevada corporation with its principal executive offices located in Dallas, Texas. During the time period relevant to the Indictment, Tenet owned and operated hospitals across the United States, including the hospitals referenced in the Indictment: Atlanta Medical Center in Atlanta, Georgia ("AMC"), North Fulton Hospital in Roswell, Georgia ("North Fulton"), Spalding Regional Medical Center in Griffin, Georgia ("Spalding"), and Hilton Head Hospital in Hilton Head, South Carolina ("Hilton Head") (collectively, the "Tenet Hospitals"). [ECF No. 20, pp. 2-3].

With the exception of Hilton Head, which is less than 300 miles from the federal courthouse for the Northern District of Georgia, Atlanta Division, **the hospitals** discussed in the Indictment are located in the **Northern District of Georgia**. [ECF No. 20, p. 3].

On May 23, 2012, the Atlanta Regional Office for HHS-OIG issued a subpoena to Tenet requesting information pertaining to contracts between the Tenet Hospitals and Clinica. On May 30, 2013, Ralph Williams amended an earlier qui tam action filed in the **Middle District of Georgia** to assert civil claims against Clinica, Tenet, and the Tenet Hospitals, as well as other hospitals. *United States of America ex rel. Ralph Williams v. Health Mgmt. Assocs., Inc. et al.*, 3:09-cv-00130, ECF No. 47 (M.D. Ga. May 30, 2013). On February 18, 2014, the United States Attorney's Office for the Middle District of **Georgia** filed a motion to intervene in the lawsuit. [3:09-cv-00130, ECF No. 143].

In 2013, the United States Attorney's Office for the **Northern District of Georgia** and the Atlanta Regional Office for the Federal Bureau of Investigation ("FBI Atlanta") initiated a criminal investigation pertaining to contracts between the Tenet Hospitals and Clinica and empaneled a grand jury in the **Northern District of Georgia.** The Government subpoenaed millions of pages of documents and called scores of witnesses to testify before the grand jury. After exhausting the grand jury's term of service, a second special grand jury was empanelled and remains active.

On July 23, 2014, and as a result of its investigation into contracts between the Tenet Hospitals and Clinica, the Government filed two separate criminal informations in the **Northern District of Georgia**, charging Tracey Cota and Gary Lang with conspiracy, in violation of Title 18, United States Code, Section 371 for "Conspiracy to Pay and Receive Remuneration in Exchange for Medicaid Patient Referrals." *See United States v. Tracey Cota,* 1:14-CR-00275-AT, ECF No. 1 (N.D. GA. July 23, 2014); *see also United States v. Gary Lang*, 1:14-CR-00274-AT, ECF No. 1 (N.D. GA. July 23, 2014).

The charges in each criminal information are factually parallel to the charges brought against Holland. On August 6, 2014, Tracey Cota entered a negotiated guilty plea in the **Northern District of Georgia** to the single count information. [14-CR-00275-AT, ECF No. 7-1]. Tracey Cota's plea agreement includes a cooperation provision, in which Cota agreed, "when called upon to do so by the Government in connection with any investigation or proceedings, [to] testify[] in grand jury, trial, and other judicial proceedings[.]" [14-CR-00275-AT, ECF No. 7-1]. On August 6, 2014, Gary Lang entered a guilty plea in the **Northern District of Georgia**. [14-CR-00274-AT, ECF No. 7-1]. Lang's plea agreement contained the same cooperation language found in Cota's plea agreement. [14-CR-00274-AT, ECF No. 7-1].

Sentencing hearings have not been scheduled for Cota and Lang. At Cota's plea hearing, counsel for the Government said, "Ms. Cota is currently cooperating in an ongoing investigation. We would respectfully request that her sentencing be postponed

to allow her to continue her cooperation." [14-CR-00275-AT, ECF No. 10]. Lang's sentencing hearing was also deferred, pending his cooperation, to include testifying at trial. [14-CR-00274-AT, ECF No. 10].

On October 3, 2016, the Government filed a Notice of Settlement in the civil case. [3:09-cv-00130, ECF No. 222]. The Notice stated that the settlement was tied to the criminal adjudication of the corporate entities AMC and North Fulton and that the settlement would be finalized after the entities had been sentenced in the **Northern District of Georgia**. [3:09-cv-00130, ECF No. 222]. That same day, the USAO NDGA filed a criminal information in the **Northern District of Georgia** charging AMC and North Fulton with conspiracy, in violation of Title 18, United States Code, Section 371 for "Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks and Bribes." *See United States v. Atlanta Med. Ctr., Inc.*, 1:16-CR-00350-AT, ECF No. 1 (N.D. Ga. Oct. 3, 2016).

On October 19, 2016, in the **Northern District of Georgia,** Judge Totenberg accepted AMC and North Fulton's guilty pleas to the respective criminal informations, triggering the civil settlement between the United States and Tenet for $368,000,000. [16-CR-00350-AT, ECF Nos. 17-20]. Additionally, Judge Totenberg approved a consent order and judgment of forfeiture as to AMC for $84,696,727 and as to North Fulton for $61,091,618, and sentenced Atlanta Medical Center and North Fulton to 1 year probation. [16-CR-00350-AT, ECF Nos. 17-20].

The civil settlement also included a non-prosecution agreement between Tenet and the Government, which Judge Totenberg reviewed as part of the adjudication of the criminal matter against North Fulton and AMC. [3:09-cv-00130, ECF No. 222; 16-CR-350, ECF No. 16-3]. The 45-page statement of facts supporting the non-prosecution agreement contains a litany of allegations defined as "The Conspiracy to Steer Clinica Patients to the Tenet Hospitals in Exchange for Unlawful Remuneration." [16-CR-350, ECF No. 16-3, p. 17].

Numerous pages are dedicated to specific recitations of allegations related to each one of the Tenet Hospitals -- AMC, North Fulton, Spalding, and Hilton Head. [16-CR-350, ECF No. 16-3, pp. 19-56].  Pages 12 to 14 (at paragraphs 4 to 18) set forth factual allegations regarding the Georgia and South Carolina Medicaid Programs, Medicare Disproportionate Share Payments, and Tenet's CIA with HHS-OIG that are nearly identical to those set forth in the Indictment charging Holland in the instant case. Additionally, paragraphs 32, 33, and 200 in the non-prosecution agreement, which allege that Holland failed to disclose reportable events under the CIA and therefore made false certifications, are nearly identical to the Indictment in the instant case.

On January 24, 2017, a grand jury in the Southern District of Florida returned the Indictment against Holland. The Indictment alleges that, from 2000 to 2013, Holland and co-conspirators engaged in an unlawful scheme to defraud through pretextual services contracts between Tenet Hospitals in Atlanta, Georgia (AMC), Roswell,

Georgia (North Fulton), Griffin, Georgia (Spalding), and Hilton Head, South Carolina (Hilton Head Hospital) and Clinica, based in Atlanta, Georgia. [Indictment, pp. 2-3, 10-11]. The Indictment alleges venue in the Southern District of Florida based on the Boca Raton, Florida location of a Tenet billing center and mailings from Tenet's corporate headquarters in Dallas, Texas to the HHS-OIG office in Miami Lakes, Florida, arriving on or about January 26, 2012. [Indictment, pp. 2, 14, 16-17].

On February 1, 2017, Holland was arraigned in the Southern District of Florida before United States Magistrate Judge Edwin G. Torres.

In the motion to transfer, Holland's counsel proffers that, during the arraignment hearing, Anthony Pozos, counsel for the Government, told the Court that the Indictment was part of a much greater, **and still active**, investigation out of the Northern District of Georgia for which additional, and more expansive charges were still being contemplated as to other co-defendants and perhaps as to Holland as well.

On February 15, 2017, the Government sent Holland's counsel a letter about discovery materials. The letter identifies 331 boxes containing volumes of documents and physical evidence in the FBI's possession, available for counsel's review at an FBI offsite location in metro Atlanta, in the **Northern District of Georgia**. According to the letter, Holland's counsel must submit all requests to review these materials, in writing, to Special Agent Steve Dunn at least 10 business days in advance.

The letter also says that there is no copier onsite. The letter identifies 276 boxes containing volumes of documents, patient files, and physical evidence in HHS-OIG's possession, available for counsel's review at HHS-OIG's Atlanta Field Office, also in the **Northern District of Georgia**. According to the letter, Holland's counsel must "submit all requests to review these materials, in writing . . . at least 5 business days in advance . . . [d]ue to limited space, only 20 boxes can be pulled from HHS-OIG's evidence room at a time." [ECF No. 20, p. 9-7].

The letter references original hard-copy evidence from Tenet of an undefined volume available for defense counsel's review at the U.S. Attorney's Office in Atlanta, also in the **Northern District of Georgia**. [ECF No. 20, p. 7]. According to the letter, Holland's counsel must "submit all requests to review these materials, in writing, to FBI Special Agent Steve Dunn at least 5 business days in advance."[1] [ECF No. 20, p. 9].

---

[1]    As this Order discusses later, when analyzing the *Platt* factors, the Government takes issue with Holland's arguments about discovery and the location of documents. For example, it notes that most of the materials at storage facilities in Atlanta were **already produced** to Holland in an electronic database. It says the only items which have not been produced in electronic format are 4 boxes of log books from Atlanta Medical Center, which have not been scanned but which were made available for inspection and copying in Atlanta. Moreover, the United States explains that it can make these four boxes available for inspection and copying in the Southern District of Florida if Holland and/or his counsel prefer. But Holland argues, in his reply, that "[e]xtensive problems" with the Government's electronic production "make in-person review of the boxes necessary." [ECF No. 32, p. 11].

## Procedural Background

Holland filed his motion to change venue on February 22, 2017, three weeks after his February 1, 2017 arraignment. [ECF Nos. 10; 20]. The United States submitted a response in opposition and Holland submitted a reply. [ECF Nos. 31; 32]. Judge Martinez issued an amended order, referring the motion to me for an Order. [ECF No. 35].[2]

## Applicable Legal Principles and Analysis

To be sure, the United States *could* have brought the indictment in the Northern District of Georgia.  It did not.  It chose the Southern District of Florida. Holland does not challenge that venue is, in fact, proper, in the Southern District of Florida. Rather, he argues that a discretionary transfer to the Northern District of Georgia should be

---

[2]      A motion for a change of venue or to transfer venue is not specifically listed in 28 U.S.C. § 636(b) as a matter which is expressly dispositive (i.e., requiring a Report and Recommendation, as opposed to an order).

The "better practice" is to view a venue transfer motion as non-dispositive -- within the sound discretion of a federal magistrate judge under 28 U.S.C. § 636(b)(1)(A), subject to appeal to the district court for an abuse of that discretion. *D'Amato v. ECHL, Inc.*, No. 13CV646S, 2015 WL 2151825, at *3 (W.D.N.Y. May 7, 2015) (collecting cases and determining that venue transfer motion was non-dispositive because, unlike a remand motion in a civil case, a motion to change venue "does not end federal court jurisdiction").

Moreover, Federal Rule of Criminal Procedure 59(a) and (b) authorizes a district judge to refer both non-dispositive and dispositive matters to a magistrate judge. The distinction between the two types of matters is whether the matter "dispose[s] of a charge or defense." Transferring the charges against Holland to another district (or not transferring the charges) would not "dispose of" a charge or defense.

ordered, primarily because he contends that it is the "primary location" of the events at issue, the place with the largest number of possible witnesses, the most accessible trial site for the vast majority of likely witnesses, and the location of the substantial majority of relevant documents.

The United States disagrees, and it argues that its choice of venue is entitled to substantial deference and that Holland has not met his burden to show that the interests of justice require a transfer.

Although the Undersigned would likely still be legally correct were I to grant the motion to transfer venue (and not have the Government's discretionary decision vacated or reversed), I view this motion as somewhat of a close call but ultimately conclude, using my discretionary assessment, that the motion should be denied. If, as outlined below, the factors used to analyze the motion are "equally balanced," then a court "should deny a motion to transfer." *United States v. Bowdoin*, 770 F. Supp. 2d 133, 137 (D.D.C. 2011) (internal citation omitted). In my view, the factors here are either equally balanced or slightly in the Government's favor.  Either way, a transfer to Georgia is not required.

Federal Rule of Criminal Procedure 21(b) provides that "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."

Federal Rule of Criminal Procedure 59(a), concerning non-dispositive matters, authorizes a referral of a matter "that does not dispose of a charge or defense." It authorizes a party to serve and file objections and directs the district judge to "modify or set aside any part of the order that is contrary to law or clearly erroneous."

Venue in a criminal case is constitutionally proper in the district where the crime was committed. *See* U.S. Const., art. III, § 2, cl. 3 (stating that criminal trials "shall be held in the State where the said Crimes shall have been committed"); *see also* U.S. Const. amend. VI (enunciating "right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.").

Where the Government charges a case in a district where venue is proper, the Government's choice of venue is entitled to substantial deference.  "So long as its choice does not create a constitutional hardship, the Government may choose, from among those districts, one where it is most convenient to pursue an indictment." *United States v. Bradley*, 644 F.3d 1213, 1252 (11th Cir. 2011); *see also Bowdoin*, 770 F. Supp. 2d at 138 ("There is a general presumption  that  a  criminal prosecution should be retained in the original district.") (internal citations omitted).[3]

---

[3]      Citing one out-of-circuit district court case, *United States v. Fritts*, No. CR05-00216, 2005 WL 3299834, at *2 (N.D. Cal. Dec. 6, 2005), Holland contends that there "is no presumption in criminal cases in favor of the government's choice of forum." [ECF No. 20, p. 8 (quoting *Id.)*]. Although that case does indeed technically include that one conclusory statement, the court did not cite any legal authority for that bold statement. Instead, it merely cited a *civil* case in which a plaintiff's choice of forum in a civil case is

As noted, Holland is not arguing that the Government's decision to bring the prosecution here is unwarranted. Rather, he seeks discretionary transfer under Rule 21(b).

"The burden falls on the defendant to demonstrate a substantial imbalance of inconvenience to himself if he is to succeed in nullifying the prosecutor's choice of venue." *United States v. Stickle*, 355 F. Supp. 2d 1317, 132 (S.D. Fla. 2004) (internal citation omitted); *see also In re United States*, 273 F.3d 380, 388 (3d Cir. 2001) ("[T]he courts have held that the criminal defendant has the burden of making the case for transfer.") (internal citations omitted).

In evaluating a Rule 21(b) motion to transfer, courts generally look to the *Platt* factors. *See Bradley*, 644 F.3d at 1253 n. 82 (affirming denial of motion to transfer); *Stickle*, 355 F. Supp. 2d at 1321 (denying motion to transfer).  Those factors include:

> the location of the defendants; the location of possible witnesses; the location of events likely to be at issue; the location of documents; potential disruption of a defendant's business; expenses to the parties; location

given deference. *Id.* (citing *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) (explaining that "great weight is generally accorded [to] plaintiff's choice of forum")).

Of course, the mere fact that a civil plaintiff's forum choice **is** given considerable weight hardly means that the Government's venue choice in a criminal prosecution is *not* given weight or that there is no presumption in favor of the Government's initial venue selection. Moreover, the Government relies on cases in which the presumption **is** followed. *Bowdoin*, 770 F. Supp. 2d at 138 (discussing Rule 21(b) discretionary transfers and noting that "there is a general presumption that a criminal prosecution should be retained in the original district"); *see also United States v. Hassanshahi*, No. 13-0274, 2015 WL 7307079, at *2 (D.D.C. Nov. 19, 2015) (analyzing Rule 21(b) transfer motion and noting the general presumption).

of counsel; relative accessibility of the place of trial; docket condition of each district involved, and any other special factors which might affect transfer.

*Stickle*, 355 F. Supp. 2d at 1321 (summarizing *Platt* factors).

These factors need not, however, be given equal weight, and the Court's decision is "within the trial court's discretionary authority[.]" *Id.* (quoting *United States v. Kopituk*, 690 F.2d 1289, 1322-23 (11th Cir. 1982)); *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) ("**No one of these considerations is dispositive,** and [i]t remains for the court to try to strike a balance and determine which factors are of greatest importance.") (internal quotation omitted) (emphasis added).

Discretionary Rule 21(b) transfers are rare. *United States v. Quinn,* 401 F. Supp. 2d 80, 85-86 (D.D.C. 2005).[4]

On the other hand, there is authority that a defendant needs to meet the burden of demonstrating grounds for a change in venue by "truly compelling circumstances." [ECF No. 20, p. 11]. Instead, some courts use the rule that "it is enough if, all relevant things considered, the case would be better off transferred to another district." *In re*

---

[4]      In *Quinn,* the Court noted that the fact-intensive and discretionary nature of the *Platt* factors makes it difficult to generalize about how courts decide which of two districts is more appropriate when either venue would be proper. *Id.* Nevertheless, it noted some discernable patterns and observed the "trend in recent years away from granting transfers to mitigate the financial, emotional, or practical burdens of trial in a distant locale." *Id.* And it explained that its view that transfers are "rare" in recent years "is hardly surprising when one considers the massive expansion of technology and the relative decline in costs for long-distance travel over the past few decades." *Id.* at 86. At the risk of stating the obvious, the state of technology today, in 2017, is significantly more sophisticated and accessible than it was in 2005, when *Quinn* was decided.

*Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995) (granting defendant's petition and directing the district court to reconsider the motion for a change of venue).

But even if I were to follow *In re Balsimo* and conclude that the Rule 21(b) standard is merely whether the case "would be better off transferred" to Georgia, a conclusion I specifically do not reach here (as I am neither adopting nor rejecting that rule), I would *still* deny the venue transfer motion. *See generally United States v. Bankas*, No. 05-CR-075-S, 2005 WL 2205340, at *1, 4 (W.D. Wisc. Sept. 8, 2005) (adopting *Balsimo* rule, noting the "limits of *Platt*," determining that "there are factors cutting in both directions," observing that "[p]erhaps a different court could reach a different conclusion" but finally concluding that the case "would not be better off transferred"); *see also United States v. Avery*, No, 09-CR-196, 2010 WL 1541342, at * 6 (E.D. Wisc. April 19, 2010) (denying defendant's motion after concluding that venue remains proper in the district selected by the Government because it is "the most appropriate district").

## A.     The Platt Factors

### 1.     Location of the Defendant

The first *Platt* factor, the location of the defendant, does not weigh in favor of transfer. Holland presently lives in Dallas, Texas.  He has lived in Dallas, Texas for the past 11 years.  In addition, Holland's second residence is located in Park City, Utah. But Holland does not seek to transfer the case to either of the two jurisdictions associated with these locations.

The Undersigned notes that Holland's residence is "only a minor consideration" because a defendant's residence, although a factor to be consider, "is not the controlling factor." *Quinn*, 401 F. Supp. 2d at 86-87. Indeed, the *Quinn* Court noted that "other courts have observed that the location of the defendant's home [lacks] independent significance in determining whether transfer to that district would be in the interest of justice." *Id.* (internal quotations and marks omitted).

Nevertheless, the defendant's residence/location is still a factor. Because Defendant does not seek to transfer the case to his district of residence, this factor does not support transfer. Instead, it is a factor which is in the Government's column (for keeping the case here).

The Government notes that virtually all district court cases in the Eleventh Circuit in which a Rule 21(b) transfer motion was granted involved a defendant who resided in the transferee district -- a scenario not present here. *United States v. Ayo*, 801 F. Supp. 2d 1323, 1333 (S.D. Ala. 2011) (granting transfer where defendant "of course" lived in transferee district); *United States v. Gotti*, 593 F. Supp. 2d 1260, 1269 (M.D. Fla. 2008) (noting that Gotti "and his family and friends are in and around New York").

2.    <u>Location of Witnesses</u>

The second *Platt* factor, the location of the witnesses, does not weigh in favor of transfer. But it does not weigh in favor of **keeping** the case here, either. Instead, I view this factor as basically a wash.

As outlined by the Government, the scheme alleged in the indictment was a fraud of national reach and significance, directly covering seven states and districts (Florida, Texas, South Carolina, Georgia, Pennsylvania, California, and the District of Columbia), and the Government's anticipated witnesses will be coming from these states, and others, to testify. Accordingly, "[t]he location of the witnesses is not dispositive by itself—particularly where, as here, witnesses actually will come from all over." *Bowdoin*, 770 F. Supp. 2d at 139.

In its opposition, the Government provided a detailed list of witnesses it anticipates calling, and it pinpointed their locations and provided a summary of each witness' likely testimony. By way of illustration, several witnesses, including the federal monitor, the Medicare Program representative, and employees at Tenet's billing center, are all located in Florida.

In his motion, Holland did not provide (1) the names of any possible witnesses whom he plans to call; (2) the locations of the possible witnesses; (3) the nature of possible witnesses' testimony; or (4) an explanation as to why these witnesses would be unable to travel to the Southern District of Florida for trial.  Moreover, he did not submit this information in his reply, after the Government highlighted this deficiency.

Instead of giving the Court a list of specific witnesses, Holland asserts arguments about the major **themes** of the case. For example, he argues that the trial testimony about the 7,000 or more individual patients "is not going to turn on the peripheral and

likely undisputed matter of where those patients' claims were mailed." [ECF No. 32, p. 8]. Rather, Holland argues, the "key issue at trial will be how those patients were actually treated and what types of services they received in relation to the contracts at issue." [ECF No. 32, p. 8].

The Government does not address this argument, even though it was highlighted in Holland's motion.  Specifically, in his motion, Holland argues that both he and the Government will likely seek to introduce testimony from witnesses located in the Atlanta area about the "core allegation that the services contracts were a pretext for a pay-for-patients scheme." [ECF No. 20, p. 16].

However, the Undersigned also realizes and finds somewhat significant the point that any burden imposed on the defendant's witnesses is mitigated by the fact that the Southern District of Florida is served by several major airports.  *See United States v. Estrada*, 880 F. Supp. 2d 478, 483 (S.D.N.Y. 2012) (finding that location of witnesses in Los Angeles did not favor transfer where the defendant could not identify any specific witnesses that were unable to travel to New York for trial, and explaining the defendant's "minimal showing of inconvenience given the large number of direct airline flights between New York and Los Angeles each day" was counterbalanced by the Government's New York-based witnesses).

In addition, despite Holland's suggestion to the contrary, trial in this district would also not impose the burden of greater travel expenses on the **witnesses** because

"travel expenses are not borne by the witness; they must be paid by the party calling the witness." *United States v. Farkas*, No. 1:10cr200, 2010 WL 3835110, at *3 (E.D. Va. Sept. 24, 2010) (internal citation omitted). And, as set forth below, the expense to Defendant does not support transfer due to his substantial assets, and the fact that Tenet, his former employer, continues to subsidize his defense.

Moreover, to the extent that defense counsel wants to interview the Georgia witnesses before trial, defense counsel is certainly free to do so. Transferring the case to Georgia would not affect any burdens associated with these interviews. The burdens, or lack of burdens, would remain the same.   Some of Holland's lawyers are based in Georgia, and they are surely able to conduct interviews of the Georgia witnesses in Georgia (assuming the witnesses are amenable) even if the case is pending in the Southern District of Florida.

Thus, by way of summary, many of the witnesses will be from Florida, many of the witnesses will be from Georgia, the financial burden associated with witness travel to Florida would not be borne by the witnesses themselves and Holland and his former employer have substantial assets. The scale for this factor does not tip one way or the other. Thus, on balance, I conclude that neither side has demonstrated that this factor supports their position on transfer.  This factor is neutral.

3.    Location of Events Likely to be at Issue

Arguing that the Northern District of Georgia is the "nerve center" of this case, Holland argues that this *Platt* factor is of "paramount" importance. But the United States argues that there is no authority in the Eleventh Circuit to suggest that the location of events should be evaluated more significantly than any other *Platt* factor. The Undersigned will evaluate all factors and strike a balance without pinpointing any specific factor (or factors) as being more important than any other factor.

As emphasized by the Government, Holland's alleged misconduct involved illegal acts in numerous jurisdictions, which means that "this factor does not favor **either** side." *See United States v. Young*, Case No. 2:12-cr-502, 2012 WL 5397185, at *3 (D. Utah Nov. 5, 2012) (finding factor did not support transfer where events at issue took place in Massachusetts, Utah, Florida and Afghanistan) (emphasis supplied); *see also Estrada*, 880 F. Supp. 2d at 483 (finding "this factor is not particularly persuasive when defendants are alleged to have intentionally projected their fraud nationwide, including into this District.").

The Government notes that the two federal districts most centrally implicated by the charges alleged in the Indictment are: (1) the Southern District of Florida, where Defendant's materially false, fraudulent, and misleading statements and omissions were received by HHS-OIG and the federal monitor <u>and which support the counts</u>

charged in the indictment[5] and (2) the Northern District of Texas, where Defendant served as Senior Vice President of Operations for Tenet's Southern States Region from 2006 through Fall 2013 -- and from where he caused the materially false, fraudulent, and misleading statements and omissions of Counts One through Four of the Indictment to be sent.

In addition, the Government contends that much of the conduct at issue in the Indictment will focus on Holland's actions, inactions, knowledge, and intent. From 2006-2013, Holland lived and worked in the Northern District of Texas, and the federal monitor worked and administrated Tenet's CIA from the Southern District of Florida, from 2009-2013.

Although evidence of events in the Northern District of Georgia will certainly be relevant and will surely be discussed at Holland's trial, Defendant overlooks the fact that he allegedly directed the fraud and bribery schemes alleged in the Indictment, from Spring 2006 through Fall 2013, from Tenet's corporate headquarters, where he worked, in Dallas, **Texas**. Defendant also ignores the fact that one of the primary victims of the fraud and bribery schemes alleged in the Indictment – the Government, through HHS-OIG -- administered and oversaw Tenet's CIA from the Southern District of Florida.

---

[5]     The mail fraud charge in Count One concerns a Federal Express parcel mailed from Texas and delivered in Miami Lakes, Florida. The health care fraud charge in Count Two concerns a Tenet annual report received in Miami Lakes, Florida. Count Three and Four's major fraud charge involves two annual Tenet reports received by the HHS-OIG in Miami Lakes, Florida. Thus, the actual criminal charges involve materials received in the Southern District of Florida.

Holland also fails to address the fact that the federal monitor received and relied upon materials sent and caused to be sent by Holland to the federal monitor in the Southern District of Florida.

The Government notes that more than 7,000 claims for patients who were unlawfully referred as a result of Defendant's fraud and bribery scheme were processed for payment at Tenet's billing center in the Southern District of Florida. These 7,000 claims generated, conservatively, millions of dollars in false and fraudulent bills to, and reimbursements from, the Medicaid program. The Government contends that these payments were central to the success of the fraud scheme alleged in the Indictment and are claims that Defendant knowingly and purposefully caused to be processed, in interstate commerce, through Tenet's National Medicare and Medicaid Center in the Southern District of Florida.

Moreover, during the relevant time period, Tenet operated 12 hospitals in South Florida, within the Southern District of Florida. These South Florida hospitals, along with all Tenet hospitals, were directly implicated in Defendant's fraud scheme.  If Tenet were excluded from the Medicare and Medicaid program by the federal government, then, the Government argues, the South Florida hospitals would not have been able to receive payment from Medicare and Medicaid, which likely would have jeopardized the continued viability and existence of the South Florida hospitals.

So there is surely a significant amount of evidence concerning events in South Florida. As noted, Holland basically ignores these events. However, the United States can also be faulted for taking a skewed view of the facts. Specifically, it did not sufficiently consider that the underlying fraud involved hospitals and clinics located in Georgia and instead placed significant emphasis on testimony from administrative employees or mail room clerks involved in the mechanical receipt of mailings.

In my view, each side has (1) raised some valid points; (2) ignored some problematic points; and (3) urged a perspective which overvalues its witnesses and evidence but undervalues the other side's witnesses and evidence.

Thus, on balance, I view this factor as being neutral.  In effect, it, too, is a wash.

4.      Location of Documents and Records

The fourth *Platt* factor, the location of documents, does not weigh in favor of transfer, although there appears to be a factual dispute over circumstances surrounding this issue.

According to the Government, it produced, at significant expense, more than 7.6 million pages of documents in electronic format to Defendant in a searchable database, in native format or both. It says that the contents of 331 boxes of documents in the FBI's possession and the contents of the 271 items in HHS-OIG's possession were  produced to Defendant in electronic format, in a searchable database, and with corresponding electronic bates ranges.  The Government further contends that as a

courtesy, in addition to producing these materials in electronic format, it also agreed to make them available for inspection and review where they are currently stored in Atlanta.

The Government also represents that the only items that the Government has not produced in electronic format are 4 boxes of "short log books" from Atlanta Medical Center, which have not been scanned, but which the Government has made available for inspection and copying in Atlanta.  According to the Government, this modest volume of documents "pales in comparison to the millions of pages of documents made available electronically, and the government can make them available for inspection and copying in the Southern District of Florida if the defendant would prefer." [ECF No. 31, p. 18].

In his reply, Holland contends that the Government's production is riddled with errors.

For example, Holland argues, the Government's production log states in row 41, "please reference HHS-OIG inventory," and provides Bates numbers COTA-00971156 to COTA-00975198. While this Bates range includes approximately *4,000* pages, Mr. Holland's e-discovery vendor has determined that the file produced by the Government that contains this Bates range inexplicably contains approximately *59,000* unique documents. [ECF No. 32, p. 11].

Holland also argues that one of the three hard drives produced by the Government thus far includes documents that have a different file name than the Bates number stamped on the actual document. He says this makes searching and finding documents nearly impossible.

Other deficiencies which Holland complains about concerning the Government's production include: (1) Hard Drive 2 contains documents that overlap with those on Hard Drive 1, but whose ending Bates numbers and ending ranges do not match and thus, Holland's e-discovery vendor is unable to determine which is the correct version to load; (2) the production log says "N/A" in the "beg doc" and "end doc" field for several of the entries, making it effectively impossible to determine whether the specified documents are actually included in the production; (3) Hard Drive 2 includes loose files that do not have any Bates numbers on them at all and to load the documents to Relativity, Mr. Holland's e-discovery vendors need to assign those documents Bates numbers; (4) Hard Drive 2 includes voluminous PDFs (i.e., 2,000+ pages) that are evidently an amalgamation of different unique documents and Holland's e-discovery vendor will need to go through and insert page breaks to separate the unique documents; and (5) Hard Drive 2 contains PDFs where the Bates range provided does not match the number of pages within the PDF.

After noting all of these purported deficiencies, Holland argues that the Government's production is not, in fact, searchable and is not in fact organized.

Therefore, Holland says, the "only way" he can "intelligently review" all documents in the Government's possession is to examine in person more than 600 boxes of documents in the Northern District of Georgia. [ECF No. 32, p. 12].

Defendant argues that the location of this original evidence in FBI and HHS-OIG storage facilities in Atlanta favors transfer to Atlanta, even though the Government contends that most of these materials have already been produced to Defendant in an electronic database.

Assuming, that the Government's electronic production is flawed and required defense counsel to inspect the materials in person in Georgia, this does not mean that the case itself should be transferred to Georgia. Holland's lead attorneys are based in Georgia. If they want to inspect the materials in person in Georgia, then they may do so. A trial in Miami would not affect their pre-trial review of documents.

Under these circumstances, this factor does not support transfer. *See Estrada*, 880 F. Supp. 2d at 483-84 ("It is well settled that given the conveniences of modern transportation and communication, the location of documents is a minor concern.") (internal quotation and marks omitted); *Farkas*, 2010 WL 3835110, at *4 (holding location of documents did not support transfer where Government produced documents in electronic format).

Finally, if defense counsel has legitimate criticisms of the Government's production, then defense counsel can pinpoint the problems and ask the Government to correct or clarify the production. Failing that, defense counsel can ask the Court to require a more-clear, less-confusing response. Moving the case to Georgia for a trial would not significantly affect defense counsel's efforts to remedy any deficiencies in production.

5.   Potential Disruption of the Defendant's Business

The fifth *Platt* factor is neutral. In fact, in his motion, Holland advises that he is retired and expects that his private consulting work in the hospital industry will suffer disruption regardless of whether the case remains in this District or is transferred. Therefore, the factor is not helpful to Holland's position. *See Farkas*, 2010 WL 3835110, at *5 (finding factor did not support transfer because "any criminal trial would disrupt [the defendant's] work, regardless of the location of trial.").

6.   Expenses to the Parties

The sixth *Platt* factor, the expense to the parties, does not weigh in favor of transfer. According to the Government, Holland has a net worth of more than $15 million, made over $4 million in the past two years, and his former employer, Tenet, is paying his legal fees. Under these circumstances, this factor does not support transfer. *Estrada*, 880 F. Supp. 2d at 484 (finding factor did not favor transfer where defendant owned homes valued at over $3 million, and made personal profits of $1.7 million in the

past six years); *see also United States v. Bagnell*, 679 F.2d 826, 832 (11th Cir. 1982) ("defendant's concerns about the expense and inconvenience of being tried away from home are ordinarily of little relevance to a motion for a change of venue.").

       7.    Location of Counsel

The seventh *Platt* factor, location of counsel, weighs *slightly* in favor of transfer.

The Government says that Holland's counsel is equally divided between the Southern District of Florida and the Northern District of Georgia. It notes that the defense law firm, Jones Day, is a national law firm with an office in Miami, Florida. And it observes that there are multiple direct flights every day from Atlanta to Miami, and the flight is two hours long. Based on these facts, the Government argues that this factor does not weigh in favor of transfer.

Moreover, the Government argues to the extent that Holland's Georgia-based attorneys are in any way inconvenienced, his decision to retain counsel from outside the district "is an inconvenience of his own choosing," which, while a valid exercise of his 6th Amendment rights, may not weigh in favor of transfer, where, as here, "[n]o claim is made, or can be made, that competent and experienced counsel cannot be found in this district." *United States v. Lindh*, 212 F. Supp. 2d 541, 552 (E.D. Va. 2002).

On the other hand, Holland notes that his primary attorneys are based in Atlanta and have been representing him for the past four years. Moreover, it appears as though many of the events relating to this investigation have already occurred in Georgia, so

Holland should not be faulted for selecting Georgia-based counsel four years ago (because he and his attorneys presumably assumed that any prosecution would take place in Georgia, where the other cases unfolded). *See United States v. Russell*, 582 F. Supp. 660, 663-64 (S.D.N.Y. 1984) (granting motion to transfer criminal prosecution from New York to Memphis and noting that the investigation began three years earlier in Memphis, when the defendants were represented by Memphis counsel).

Holland further notes that the primary Government attorneys are all based in Washington, D.C. and will need to travel *regardless* of whether the case is in Miami or Atlanta. *See e.g., United States v. Burke*, 607 F. Supp. 2d 1314, 1324 (M.D. Fla. 2009) (granting motion to transfer venue from Tampa to the Eastern District of New York as "the United States enjoys office, staff, and resources at every federal venue and typically is not disadvantaged in the Rule 21(b) sense by a transfer").[6]

This factor is slightly in the transfer column.

8.   Relative Accessibility to Place of Trial

The eighth *Platt* factor, the relative accessibility to place of trial, does not weigh in favor of transfer. The Southern District of Florida, with its numerous airports including Miami International Airport, Fort Lauderdale-Hollywood International

---

[6]   The Undersigned is not persuaded by the Government's argument that the prosecution team will be able to work out of the South Florida Medicare Fraud Strike Force facility in Miramar, Florida, thereby "likely resulting in government savings for litigation support-related expenses." [ECF No. 31, p. 20]. The Government did not say whether it also maintains a similar strike force in the Atlanta area.

Airport, and Palm Beach International Airport, is, like the Northern District of Georgia, a major transportation hub. Accordingly, this factor does not favor transfer. *See, e.g., Estrada*, 880 F. Supp. 2d at 484 (finding major hubs, New York and Los Angeles, to be equally accessible as "the efficiency of modern air transportation attenuates accessibility concerns") (internal quotation and marks omitted).

9. <u>Docket Conditions of Each District Involved</u>

The ninth *Platt* factor, the docket conditions of each district involved, does not weigh in favor of transfer. The Government claims that, according to the Administrative Office of the U.S. Courts, the median time from filing to disposition in criminal felony cases in the Southern District of Florida is 4.2 months, and 10.0 months in the Northern District of Georgia. Under these circumstances, in which the Southern District of Florida resolves cases more than twice as quickly the Northern District of Georgia, "[t]ransfer of this case to the Northern District of Georgia could result in substantial delay" and "[t]hus, this factor does not support transfer." *United States v. Logan*, 1:12cr506, 2013 WL 1450547, at *4 (E.D. Va. Apr. 4, 2013); *see also Young*, 2012 WL 5397185, at *6 (explaining that "the relevant statistics are those that indicate whether the district can more easily give the defendant a speedy trial").

10. <u>Other Special Factors</u>

Holland does not address this issue in either his motion or reply. The Government contends that United States District Judge Jose E. Martinez has experience

presiding over cases against hospital executives charged with orchestrating fraud and kickback schemes and suggests that this factor "makes this Court particularly well suited to preside over the trial in the instant case."  [ECF No. 31, p. 22].

Judge Martinez may well have ample experience trying Medicare fraud prosecutions, but the Undersigned does not view this as a significant special factor militating against a transfer to Georgia.  Therefore, I view this final factor as neutral.

<u>Conclusion</u>

Holland has not established a substantial imbalance of inconvenience to himself if the case were to remain here in the Southern District of Florida. The *Platt* factors are either neutral or slightly in favor of the Government. My assessment is that there are insufficient grounds to interfere with the Government's choice of venue, which is a legally permissible venue, and I therefore deny the motion.

**DONE and ORDERED** in Chambers, in Miami, Florida, on March 21, 2017.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>Copies furnished to</u>:
The Honorable Jose E. Martinez
All counsel of record