# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

**CASE NO. 17-CR-20054-MARTINEZ/GOODMAN**

UNITED STATES OF AMERICA

v.

JOHN HOLLAND,

     Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION FOR RECONSIDERATION OF RULING DENYING A REQUESTED VENUE TRANSFER TO THE NORTHERN DISTRICT OF GEORGIA

*Georgia, Georgia, the whole day through, Just an old song, Keeps Georgia on my mind[1]*
-    Ray Charles

*He's leavin' (leavin') on that midnight train to Georgia[2]*
-    Gladys Knight and the Pips

Defendant John Holland ("Defendant" or "Holland") has filed a motion for reconsideration [ECF No. 40], asking the Undersigned to again evaluate his motion [ECF No. 20] to transfer venue to the Northern District of Georgia. The Undersigned initially entered an Order [ECF No. 36] denying the motion. But I also noted that an

---

[1]    RAY CHARLES, *Georgia On My Mind, on* THE GENIUS HITS THE ROAD (ABC Records 1960).

[2]    GLADYS KNIGHT AND THE PIPS, *Midnight Train to Georgia, on* IMAGINATION (Buddah 1973).

1

order *granting* the motion "would still likely be correct" and also highlighted that the ruling on the motion is "somewhat of a close call."

Holland's reconsideration motion, combined with his under-seal list of anticipated trial witnesses [ECF No. 51] and supplemental memorandum [ECF No. 54], now provides sufficient grounds for a discretionary transfer.[3] For all practical purposes, the nerve center of the significant, non-routine portion of the prosecution's case is in Georgia. Likewise, most of the defense witnesses are also located in Georgia. And the vast majority of the witnesses involved in the **genuinely disputed facts** are in Georgia.

From a legal perspective, I now agree with Holland's argument that he does not have the burden of proving a substantial imbalance of inconvenience. That standard does not appear in Federal Rule of Criminal Procedure 21 and the United States has not called attention to any binding legal authority requiring the standard to be applied here. Moreover, other district courts in the Eleventh Circuit have granted transfers without applying the "substantial imbalance of inconvenience" standard.

As outlined in greater detail below, Holland has now demonstrated that a sufficient number of the *Platt* factors militate in favor of a transfer. The lead prosecutors are not based in South Florida or the Northern District of Georgia. On the other hand, most of the hospitals at issue are in Georgia. Likewise, most of the medical services at issue were provided in Georgia. To be sure, *some* of the activities at issue occurred in

---

[3]     The Undersigned authorized Holland to file his list of anticipated defense witnesses and his supplemental memorandum concerning the Superseding Indictment.

Florida, but they are largely administrative-type events which will either not be challenged or are capable of proof through a succinct and streamlined presentation. The real meat and potatoes which will be served to the jury involve Georgia-based witnesses providing testimony about events occurring in Georgia. Most of the other *Platt* factors are neutral, as the Undersigned noted in the original order.

For the reasons explained below, the Undersigned hereby **grants** Holland's motion for reconsideration, **grants** the motion to transfer this case to the Northern District of Georgia and **transfers** the case to the Northern District of Georgia. The Undersigned hereby **directs** the Clerk to send the file, or a certified copy of it, and any bail taken, to the Clerk of Court for the Northern District of Georgia.

**(*Additional* Factual Background)**

The Undersigned adopts the factual and procedural background from the earlier Order. However, this Order will also supplement those facts with additional facts which Holland flagged in his reconsideration motion and witness list.

Following up on the Order [ECF No. 44] permitting him to file under seal a list of anticipated witnesses, Holland submitted a list of anticipated defense witnesses for my *in camera* review. Although I will not disclose the identities of the anticipated defense witness because that would undermine the reason for the under-seal filing, I am able to make some public observations about the list.

First, 49 of the 68 anticipated defense witnesses are in Georgia. Only 4 of the 48 are in Florida. The remaining 15 witnesses are all from states other than Georgia or Florida. Second, Holland provided a description of each witness's anticipated trial testimony. All the witnesses listed appear to be substantively significant witnesses. In other words, it does not seem as though Holland included witnesses from Georgia on the list merely because they happen to live in Georgia. Rather, the listed witnesses all appear to be factually involved in the issues which will likely arise at trial.

Third, only four hospitals are named in the Superseding Indictment and three of them -- Atlanta Medical Center in Atlanta, North Fulton Hospital in Roswell and Spalding Regional Medical Center in Griffin -- are in Georgia. The fourth hospital, Hilton Head Hospital, is not in Florida *or* Georgia (i.e., it is in South Carolina).

Fourth, the Superseding Indictment [ECF No. 42] lists four patients in the five wire fraud counts (Counts 5-9). According to Holland's witness list, all of the medical professionals and staff who treated these four patients worked in the Northern District of Georgia, at either Atlanta Medical Center or North Fulton Regional Hospital.

Fifth, Holland submitted medical records to demonstrate where the medical services at issue were provided and to confirm their relevance to the case.

In addition to submitting a list of anticipated defense witnesses, Holland also explained, in his motion, the significance or lack of significance of certain facts. For example, Holland contends that the 12 hospitals the Government alleges to be located in

the Southern District of Florida have nothing to do with the facts of this case. There is not a single allegation in the indictment alleging any impropriety at any hospital in the Southern District of Florida. Similarly, he emphasizes that in the 244-paragraph Statement of Facts supporting the corporate non-prosecution agreement, there is not a single reference to any hospital in the Southern District of Florida.

Therefore, Holland argues, the mere presence of 12 Tenet hospitals in the Southern District of Florida is totally fortuitous and irrelevant to this case.

In that same vein, Holland also contends that there is no national significance to this case. Both the indictment and the above referenced Statement of Facts refer to only 4 hospitals, all located in the Northern District of Georgia and South Carolina.

<u>Circumstances Leading up to the Reconsideration Motion</u>

In its response, the Government argues that the materials upon which the reconsideration motion is based were available before the motion to transfer was filed and contends that Holland "did not exercise due diligence to discover the information contained in the Materials[.]" [ECF No. 52, p. 7]. Given this challenge, the Undersigned will provide (albeit in a modestly edited format) Holland's description of the events surrounding his filing of the original motion and the reconsideration motion [ECF No. 40]: [4]

---

[4]     Holland uses the "Doc" reference to identify submissions on the CM/ECF docket, while the Undersigned uses "ECF." Because I am quoting Holland's submission, I am using "Doc" in the quoted material.

On January 25, 2017, Mr. Holland was charged with one count of mail fraud, one count of health care fraud, and two counts of major fraud against the United States (Doc. 1). Mr. Holland was arraigned on February 1, 2017, and, on the same date, Magistrate Judge Edwin G. Torres entered a Paperless Standing Discovery Order ordering compliance with discovery obligations under Local Rule 88.10 within 14 days. (Doc. 10). On February 15, 2017, the Honorable Jose E. Martinez entered a consent protective order governing the discovery in this case. (Doc. 18).

 On February 16, 2017, the government sent undersigned counsel its first document production accompanied by a cover letter stating that grand jury transcripts, exhibits, and law enforcement interview reports were available for defense counsel review, in person at the Department of Justice's Criminal Division's offices in Washington D.C., with two business days written notice. (Doc. 21–1). No log of those grand jury transcripts, exhibits, and law enforcement interview reports was provided.

On February 22, 2017, Mr. Holland filed the Motion on the grounds that the Northern District of Georgia is the nerve center of the allegations, the location of defense counsel, the vast majority of trial witnesses, physical evidence, and an ongoing grand jury investigation, as well as the district with the most extensive ties to the case based on its familiarity and involvement with related prior individual and corporate criminal proceedings. (Doc. 20). Mr. Holland requested a hearing on the Motion. (*Id*.). On March 2, 2017, the government responded in opposition to the Motion. (Doc. 31).

After providing the required notice, on March 8, 2017, a Jones Day associate reviewed the grand jury transcripts and law enforcement interview reports at the Criminal Division's offices in Washington, D.C. These documents were so voluminous that the associate had to return on March 15, 2017, at which time [defense] counsel became aware that the Criminal Division offices contained a total of 76 grand jury transcripts and 466 law enforcement interview reports related to this case. On March 20, 2017, [defense] counsel and a team of five traveled from Atlanta, Georgia to Washington, D.C. to begin reviewing the materials. The following day, this Court issued its Order denying Mr. Holland's request to transfer this case to the Northern District of Georgia. (Doc. 36).

## The Superseding Indictment

On March 28, 2017, the same day that Holland filed his reconsideration motion, a federal grand jury sitting in the Southern District of Florida returned a superseding indictment charging Holland in five new counts. [ECF No. 42]. Specifically, the superseding indictment charges Holland with wire fraud in Counts 5-9. All of the charged wires supporting Counts 5-9 of the Superseding Indictment are either: (a) interstate wire communications between Tenet's billing center in Boca Raton, Florida and Tenet facilities in Texas; or (b) an interstate email communication between the Federal monitor in the Southern District of Florida and a Tenet executive in Texas. [ECF No. 42, p. 21]. None of the charged wires passed through Georgia. [ECF No. 42, p. 21].

Although none of the charged wires passed through Georgia, Holland contends, in his supplemental memorandum, that the new counts actually *support* a transfer of venue to the Northern District of Georgia. Holland makes the following argument:

Holland emphasizes that the Superseding Indictment alleges that as a result of a wire fraud scheme operating from 2000 to 2013, "various expectant mothers (i.e., Clinica patients[5]) received **problematic and disparate care and treatment while at the Tenet**

---

[5]     The Superseding Indictment alleges that Hispanic Medical Management, Inc. was a corporate entity which did business as Clinica de la Mama ("Clinica"). [ECF No. 42, p. 2]. It further alleges that Clinica held itself out "as operating medical clinics that provided prenatal care to predominantly undocumented Hispanic women in Georgia and South Carolina." [ECF No. 42, p. 2].

*Hospitals*, including treatment that involved, at the least, a reckless risk of serious personal and bodily injury[,]" and then identifies four Clinica patients who delivered babies at Tenet hospitals in the Northern District of Georgia (either at Atlanta Medical Center or North Fulton Regional Hospital). [ECF No. 42 (emphasis added)]. According to Holland's view of the Superseding Indictment, these new allegations squarely challenge the general quality of patient care at Tenet hospitals in the Northern District of Georgia as well as the specific care rendered to the four identified Clinica patients at the same Georgia hospitals.

Holland says he will need to elicit testimony from all four patients and from the teams of healthcare professionals involved with the care of those patients, including doctors, mid-wives, nurses, interpreters, and various Clinica and Tenet hospital staff members. Holland further represents that his preliminary investigation has confirmed that all of the identified patients and delivering physicians reside in the Northern District of Georgia.

Holland further notes that he is continuing to investigate the identities of all of the Clinica and Tenet hospital medical staff and other professionals involved in the care of the patients but, based on information obtained to date, has a good faith belief that the vast majority of those witnesses also reside in the Northern District of Georgia.

To rebut the allegations in the Superseding Indictment, Holland intends to call other Clinica patients who received care at the Tenet hospitals from 2000-2013, as well

as Tenet hospital medical staff and other professionals involved in their care. He says he has a good-faith belief that all of these witnesses reside in the Northern District of Georgia.

As portrayed by Holland, a Miami trial on the Superseding Indictment would create an inconvenient logistical headache for many of the witnesses. For example, he argues that the former patients now placed at issue, mothers of school-aged children, would have to miss work and family obligations to travel by plane from Atlanta for trial in Miami. Similarly, he notes that the physicians (all of whom appear to have active OB/GYN practices in the Northern District of Georgia) would have to leave their Atlanta practices unattended and their patients waiting. And he argues that the Tenet hospital and Clinica staff would be similarly inconvenienced.

## The Trial Date

On March 23, 2017, the Undersigned entered a Report and Recommendations [ECF No. 37] which, among other things, recommended that the case be deemed complex and that Judge Martinez grant the motion to continue the trial and continue the trial for at least 90 days past the current trial date. Judge Martinez affirmed and adopted the Report and Recommendations and rescheduled the trial for July 10, 2017. [ECF No. 41]. My Report and Recommendations, however, was issued before the March 28, 2017 Superseding Indictment [ECF No. 42] was issued (which added five additional counts). In addition, Judge Martinez's Order was signed on March 28, 2017 but was

uploaded on CM/ECF at 8:47 a.m. on March 29th. The Superseding Indictment was filed

on March 29, 2017 at 2:53 p.m. -- after Judge Martinez rescheduled the trial and after his

trial rescheduling order was filed on CM/ECF.

Given these developments and the juxtaposition between the relevant filing

dates, it is far from clear that the July 10, 2017 trial date will still be viable, though it

technically still is listed on the CM/ECF docket as the trial date.

<u>Holland's View of the Additional Relevant Facts</u>

In his reconsideration motion, Holland explains that his legal team has now

partially reviewed 466 law-enforcement reports and 76 grand-jury transcripts (all from

proceedings before a grand jury sitting in the Northern District of Georgia). He says

there are approximately 400 unique witnesses who have been interviewed by law

enforcement agents and/or testified before the grand jury in the four-year investigation

of the case.

He contends that a preliminary analysis of the 400 unique witnesses reveals the

following: (1) approximately 100 witnesses were employees, doctors, or interpreters

who worked at North Fulton, or patients who delivered babies at North Fulton (i.e., in

the Northern District of Georgia); (2) approximately 110 witnesses were employees,

doctors, or interpreters who worked at Atlantic Medical Center ("AMC"), or patients

who delivered babies at AMC (i.e., in the Northern District of Georgia); (3)

approximately 90 witnesses were Clinica patients who delivered at Tenet hospitals in

Georgia (i.e., in the Northern District of Georgia), and many of whom likely now have school-aged children; (4) approximately 25 witnesses were employees, doctors, or interpreters who worked at Hilton Head; and (5) in total, more than 300 witnesses appear to live in Georgia.

Holland also contends that the grand jury transcripts and interview memoranda show that there are: (1) *no* law enforcement interviews or grand jury testimony from any Florida witness affiliated with the Medicare Program; (2) *no* law enforcement interviews or grand jury testimony from any witness affiliated with Tenet's Boca Raton billing center; (3) *no* law enforcement interviews or grand jury testimony from any Florida internal or external Tenet counsel; and (4) *no* law enforcement interviews or grand jury testimony from any witness affiliated with any of the 12 unrelated Tenet hospitals located in the Southern District of Florida that are discussed in the government's response brief.

Holland further contends that his counsel has been able to identify only *two* government witnesses who appear to live in the Southern District of Florida: (1) the federal monitor, who was interviewed, apparently for the first time, on January 18, 2017, less than one week before the indictment, and (2) a former Tenet employee, unaffiliated with Tenet's billing center or any of Tenet's individual hospitals.

Moreover, as noted above, Holland amplified his position in the supplemental memorandum by addressing the witnesses he believes would be critical for the five additional counts charged in the Superseding Indictment.

The Government's View of the Additional Facts

In its response opposing the reconsideration motion, the United States listed the Florida witnesses it intends to use at trial: (1) Stephen Quindoz from Jacksonville, Florida (a Medicare Representative); (2) Felicia Heimer from South Florida (HHS-OIG's federal monitor); (3) Sonny Doiron-Heiss from South Florida (a representative from Tenet's Boca Raton, Florida billing facility); and (4) Jacinta Titialii from Sarasota, Florida (Tenet's in-house counsel).

In addition, the United States also represented that it presently intends to call, either in its case-in-chief or in its rebuttal case, individuals who live in Florida, the Washington, D.C. area, Pennsylvania, Tennessee, California, South Carolina, Texas and Georgia. It did not, however, explain how many witnesses from each state it intends to use at trial, or for what purpose.

Although Holland argues that issues surrounding Tenet's filing for and receipt of, payment for Medicaid claims from offices in the Southern District of Florida are "largely uncontested," the United States points out that Holland recently rejected a proposed stipulation to these very facts. Therefore, the United States may be required to call several additional South Florida witnesses to testify about "ministerial functions,

such as the processing of interstate wires (e.g., Medicaid claims) and the receipt of mailing (e.g., materials received by the federal monitor)." [ECF No. 52, p. 9].

<u>The Government's Description of Holland's "Factual Misstatements"</u>

In its response, the United States notes the following "inaccuracies and potentially misleading statements" in Holland's reconsideration motion:

1.      "There are no law enforcement interviews or grand jury testimony from any witness affiliated with Tenet's Boca Raton billing center." [ECF No. 40, p. 6].

The United States says this is not accurate.  It contends that it made available to the defense FBI 302s for Sunny Doiron-Heiss. Ms. Doiron-Heiss, according to an FBI 302 made available to the defense, served as the Regional Medicaid Manager at Tenet's National Medicare and Medicaid Center in Boca Raton, Florida, from approximately 2006 through approximately 2010-2011.

2.      "There are no law enforcement interviews or grand jury testimony from any Florida internal or external Tenet counsel." [ECF No. 40, p. 6].

The Government contends that this is not accurate.  It says it made available to the defense the testimony of Tenet's internal counsel, who interacted directly with Holland and who currently resides in Sarasota, Florida.

3.      "There are no law enforcement interviews or grand jury testimony from any witness affiliated with any of the 12 unrelated Tenet hospitals located in the

Southern District of Florida that are discussed in the government's response brief." [ECF No. 40, p. 6].

The Government advises that it did not, in any of its filings, represent that it intended to call a witness from the Florida hospitals. The Government points out that it merely noted only that Tenet's exclusion from the Medicare and Medicaid programs, directly resulting from Holland's fraud, likely would have jeopardized the continued viability and existence of the South Florida hospitals. Therefore, the United States argues that any suggestion that it represented or suggested that it would call a witness from the South Florida hospitals is factually inaccurate. [However, the Court notes that the Government's response is, in effect, a concession that it has no such interviews or testimony and that it has no plans to call Florida hospital witnesses.].

4.     "All such witnesses (relating the events that occurred in the hospitals located in the Northern District of Georgia and Hilton Head, South Carolina) are located in the Northern District of Georgia and Hilton Head, South Carolina." [ECF No. 40, p. 9].

The United States' position is that this is not accurate. To the extent that Holland asserts that individuals who worked at the Georgia and South Carolina hospitals, at the time of the charged conduct, all currently reside in these locations, the United States says this is not true. It notes that many of the individuals who formerly worked at the Georgia and South Carolina hospitals no longer live in either Georgia or South Carolina.

It did not, however, explain **how many** of the witnesses no longer live in those two states, nor does it explain whether witnesses who worked in Georgia are now in *Florida*.

The United States also argues that venue in the Northern District of Georgia would be inappropriate now because the venue for the five new mail fraud counts would not be there (so the Government contends that the entire case should not be tried there). Holland's response is to note that he has waived any venue objections to having Counts 5 through 9 in the Northern District of Georgia.

In its sur-reply [ECF No. 55], the United States emphasizes that (1) none of the Georgia witnesses will be called by the Government to establish the fact of the new wires; (2) the new wire charged in Count 8 will require it to call the federal monitor to testify and will also cause Tenet witnesses from Texas to testify about the physical location of Tenet's email servers and related email accounts; (3) "several" of the clinicians associated with the care of the Clinica patients in Georgia are now located across the country; and (4) the new wire fraud counts place at issue not only conduct in Georgia but also conduct in Florida, South Carolina, Texas, Pennsylvania and California.

## Applicable Legal Standards

Federal Rule of Criminal Procedure 21(b) provides the authority for a transfer "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). When evaluating a Rule 21(b) motion, courts generally

consider the factors established in *Platt v. Minnesota Mining and Manufacturing Co.*, 376 U.S. 240 (1964) ("*Platt* factors").

In evaluating a Rule 21(b) motion to transfer, courts generally look to the *Platt* factors. Those factors include:

> the location of the defendants; the location of possible witnesses; the location of events likely to be at issue; the location of documents; potential disruption of a defendant's business; expenses to the parties; location of counsel; relative accessibility of the place of trial; docket condition of each district involved, and any other special factors which might affect transfer.

*United States v. Stickle*, 355 F. Supp. 2d 1317, 1321 (S.D. Fla. 2004) (summarizing *Platt* factors).

These factors need not, however, be given equal weight, and the Court's decision is "within the trial court's discretionary authority[.]" *Id.* (quoting *United States v. Kopituk*, 690 F.2d 1289, 1322-23 (11th Cir. 1982)); *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) ("**No one of these considerations is dispositive,** and [i]t remains for the court to try to strike a balance and determine which factors are of greatest importance.") (internal quotation omitted) (emphasis added).

Holland concedes that he has the burden to show that transfer is justified by the "convenience of the parties, any victim, and the witnesses, and in the interest of justice." But he disagrees that the Court needs to find a "**substantial** balance of inconvenience to grant transfer."

The "substantial balance of inconvenience" standard is not found in any binding authority. There are some out-of-circuit cases which use the language, and there are also some district courts in our circuit which also use that standard. But there are other courts which do **not** adopt that standard.

For example, in *United States v. Albehady-Sanchez*, 2:12-cr-48-FTM-29SPC, 2012 WL 6006810, at *2 (M.D. Fla. Dec. 3, 2012), the Court granted a transfer motion after reviewing the *Platt* factors because "enough of the factors" favored a transfer to New Jersey. *Id.* In granting the motion and transferring the case, the judge said the factors arose "in a manner not typical of the usual case," or were "essentially neutral" and concluded that he was "satisfied that the matter is best handled in New Jersey." *Id.*

Likewise, in *United States v. Gotti*, 593 F. Supp. 2d 1260, 1270-71 (M.D. Fla. 2008), the Court granted a transfer motion without applying the "substantial imbalance of inconvenience" standard. In doing so, the Court noted that the *Platt* factors are "neither exhaustive nor exclusive[.]" *Id.* at 1269. Moreover, the Court focused on the relatively amorphous and flexible "any other special elements" factor to reject the Government's position urging that the case remain in Tampa federal district court. *Id.*

The "special element" in *Gotti* was that federal charges filed in Florida charged the same RICO conspiracy against which Gotti defended himself three times in New York. *Id.; see also United States v. Ayo*, 801 F. Supp. 2d 1323, 1333 (S.D. Fla. 2011) (granting transfer from Alabama federal district court to Louisiana federal district court

where "on balance [*Platt* factors] favor transfer" and not applying the "substantial imbalance of inconvenience" standard); *United States v. Maharaj*, No. 1:06-CR-028-SPM, 2007 WL 2340495, at *1 (N.D. Fla. Jan. 31, 2007) (granting motion because "convenience dictates" a transfer, not applying the "substantial imbalance of inconvenience" standard and concluding that the transferee district "is a more appropriate venue for this prosecution").[6]

In its response, the United States does not affirmatively contend that the "substantial imbalance of inconvenience" standard applies. Instead, it quotes from my earlier Order, where I noted that I would deny the transfer motion *even if* the standard were merely whether the case "would be better off transferred" to Georgia. [ECF No. 36, at p. 22]. The "better off transferred" standard is from *In re Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995).

In *Balsimo,* Seventh Circuit Chief Judge Richard Posner, writing for a unanimous panel, granted a petition for a writ of mandamus, concluded that the district court "truncate[d] the right conferred by Rule 21(b)" and directed the district court to reconsider the motion for a change of venue (from Wisconsin to Minnesota). *Id.* at 187. The Court held the rule or the cases interpreting it does not place on the defendant the burden of establishing "truly compelling circumstances" for a venue change. *Id.* The

---

[6]       The *Maharaj* court also noted that the rule "is broad[.]" *Id.*

appellate court (citing *Platt*) held that the test is if "all relevant things considered, the case would be better off transferred to another district." *Id.* (internal citations omitted).

For purposes of this motion, I am not using the "substantial imbalance of inconvenience standard" (even though I mentioned it in my earlier Order). Instead, the Undersigned underscores the view that the standard is a flexible one, which evaluates all the relevant *Platt* factors and which ultimately leads to the conclusion that this case should be transferred to the Northern District of Georgia.

I am not going to repeat my analysis for the *Platt* factors which have not changed since the initial Order. The two factors generating the different result here are the second (location of witnesses) and third (location of events likely to be at issue) factors, and those are the only ones discussed here.

I previously concluded that both factors were neutral. Based on Holland's motion and his list of anticipated witnesses, I now consider these two significant factors to **favor** transfer.

<u>Location of Witnesses</u>

The second *Platt* factor, the location of the witnesses, weighs in favor of transfer.

Witnesses are not fungible. They are not all alike. There are witnesses, and then there are **witnesses.** Witnesses who testify about ministerial, routine issues, such as the evidentiary foundation for a business record, may be on the witness stand for only a

few minutes. On the other hand, witnesses deeply involved in the challenged conduct might be on the witness stand for *days.*

The few Florida witnesses pinpointed by the Government appear to be in the first category -- witnesses whose testimony will not be provocative or subject to extensive challenge on cross-examination. Thus, even if Holland does not stipulate to the admissibility of documents sent to Florida, the testimony of Government witnesses about the receipt and handling of those reports and submissions is not anticipated to last long, nor is it expected to be controversial. To the contrary, if the Government still actually needs their testimony by the time of trial, then the witnesses will likely provide direct, succinct, and routine testimony. For the most part, this testimony will be largely uncontested and will concern facts which need little proof, such as the mailings of documents into Florida.

For example, the Government's need to "establish" that five wires were sent and that email servers are located in Texas may well be entirely correct but it is hardly persuasive. To establish that five wires were sent and that email servers are located in Texas is likely to require no more than a few minutes of testimony. And the fact that Georgia witnesses will not be called to establish this limited-purpose goal is not significant.

Moreover, the Government's arguments about non-Georgia witnesses who will provide substantive, non-routine, more-than-a-few-minutes of testimony, is vague and

not particularly helpful. Arguing that "several" of the clinicians are located across the country is too imprecise to assist the Court's analysis. Is the Government talking about 3 witnesses, or does it have a dozen in mind? And what is the comparison point? Eight clinicians from out of Georgia might, on the surface, sound like a substantial number of witnesses, but if the overall perspective is 8 out of 58 clinicians, then the number would be far-less significant.

Likewise, the Government's representation that it presently intends to call "witnesses" from Washington, D.C., Tennessee, Texas and Georgia does not provide much helpful insight either. If this representation actually involves 30 witnesses from Georgia, 3 from Texas, 2 from Tennessee and 2 from Texas, then the argument for opposing Holland's requested transfer to Georgia is far from convincing.

Given that the Government is aware of the *Platt* factors and Holland's decision to accept my offer to permit him to submit a list of anticipated defense trial witnesses, the Government had good cause to be specific (and little reason to be vague and non-specific). The United States' decision to provide only generalized representations about the location and significance of trial witnesses does not advance its position. To the contrary, it undermines its argument.

On the other hand, Holland's emphasis on witnesses involved in patient care (i.e., the actual patients and the physicians and nurses who treated them) will concern witnesses who will provide significantly-more substantive testimony, and who likely

will be subjected to comprehensive cross-examination. And Georgia hospital executives involved in the administration of the contracts and the alleged creation of financial arrangements designed to cover up what the Government says was actually going on would also be expected to provide detailed testimony (and be subjected to more-than-cursory cross-examination).

The key issue at trial will be how those patients were actually treated, what types of services they received in relation to the contracts at issue, whether kickbacks were paid and whether certain other contractual arrangements were legitimate (as opposed to being shams, intended to hide the actual nature of the relationships). Both Holland and the Government are likely to seek to introduce testimony from witnesses located in the Atlanta area about the "core allegation that the services contracts were a pretext for a pay-for-patients scheme." [ECF No. 20, p. 18].

Not only are the witnesses from Florida and Texas likely to be involved only in routine, ministerial-type issues, but they are significantly outnumbered by the Northern District of Georgia witnesses. According to Holland's reconsideration motion, almost 300 witnesses, approximately 75% of all interviewees and grand jury witnesses, are based in Georgia -- while less than 1% are based in the Southern District of Florida. This generates a powerful reason to view the witness location issue as being in favor of transfer. *United States v. Burke*, 607 F. Supp. 2d 1314, 1323-24 (M.D. Fla. 2009) (granting transfer where the "lopsided majority of the events pertinent to this prosecution

occurred, and the persons likely to testify about those events, reside in and around New York City or are situated nearer or more conveniently in New York City than to the Middle District of Florida and to Tampa").[7]

For purposes of evaluating the *Platt* factors, a Texas witness who will provide 10 minutes of testimony about the location of email servers to establish the existence of the wires cannot be fairly compared to a Georgia health care provider who might testify for one or two days. Although it is difficult, if not impossible, to make a specific witness-by-witness comparison, one Georgia clinician might be far more significant than three administrative-type witnesses from Texas and two witnesses from Florida, combined.

Location of Events Likely to be at Issue

Holland argues that the Northern District of Georgia is the "nerve center" of this case, and the Undersigned's now-updated view of the case suggests that this seems to be an accurate perception.

There is no doubt that some of the events occurred outside of the Northern District of Georgia. But the primary events which are **likely to be litigated at trial** involve the conduct underlying the Clinica contracts at the Tenet hospitals in the Northern District of Georgia and South Carolina -- not the ancillary billings of Medicare

---

[7] The *Burke* Court concluded that the defendants "establish a substantial balance of inconvenience." *Id.* at 1325. However, the judge in that case, United States District Judge Steven D. Merryday, also issued a transfer order in *Gotti* **without** using that standard. 593 F. Supp. 2d at 1270-71.

claims in Florida. While it is true that the receipt of a bill in Florida is an "event" in Florida, this fact is not one which will require a significant amount of court trial time.

In my view, the more-significant events for the *Platt* analysis are those which involve conduct, motive, knowledge, planning, business and financial strategies and similar meaty issues. A substantial portion of those types of events occurred in the Northern District of Georgia.

Similar to the arguments asserted in its sur-reply about the location of witnesses, the Government's approach toward the location of events issue is also detail free and nebulous. Advising the Court that evidence about the treatment and care of Clinica patients will involve conduct in Texas, Florida, Georgia and South Carolina may well be correct, but the failure to discuss the relative significance of those events (and whether they will be contested and substantive) detracts from the Government's opposition. If three of the hospitals are in Georgia and one is in South Carolina, then it seems that approximately 75% of the witnesses concerning care will be from Georgia, 25% will be from South Carolina -- and 0% will be from Florida.

Moreover, it may well be correct that, as the Government posits, Florida is where the problematic treatment "should have been disclosed by Holland and his co-conspirators to the federal monitor[.]" [ECF No. 55, p. 3]. But that does not render Florida a significant location for the location of events factor. That issue could be handled in two questions, each receiving a one-word answer, to the federal monitor: (1)

"Where should Holland and his co-conspirators have disclosed the problematic treatment?" (answer: Florida) and (2) "Did Holland or anyone else disclose the problematic treatment?" (answer: no).

The Government's Venue Argument

Contrary to the Government's assertion, the jurisdictional nexus of the alleged wires in Counts 5-9 of the Superseding Indictment does not impede this Court's ability to transfer venue to the Northern District of Georgia. There is no requirement under Federal Rule of Criminal Procedure 21 that venue be constitutionally proper in the transferee district. *See* Fed. R. Crim. P. 21.

In any event, Holland waived his right to challenge venue in the Northern District of Georgia through filing a motion to transfer, and, as such, the Government's emphasis on where venue properly lies is misplaced and immaterial to the *Platt* analysis. *See, e.g., United States v. Miller*, 314 F.R.D. 574, 579 (S.D. Ohio 2016) ("[E]ven assuming that none of the conduct alleged in the Ohio mail fraud counts began or passed through the Northern District of California, improper venue would not hinder prosecution if Defendants waive the issue, which all Defendants have so done in this case, both expressly and impliedly, by filing the motions seeking transfer.") (internal citations omitted).

## Conclusion

The Northern District of Georgia is the central location of the key events and witnesses that will be at issue during trial. On the other hand, the relatively small number of Florida witnesses are expected to provide testimony on primarily garden-variety, administrative-type issues. The nuts and bolts of the case (i.e., the patient care, and whether it was legitimate, overbilled, necessary, involved in a kickback scheme or otherwise problematic) will largely turn on the testimony and evidence from witnesses in the Northern District of Georgia.

As a result, Holland has met his burden of establishing that a transfer is appropriate under the *Platt* factors used to evaluate transfer motions under Federal Rule of Criminal Procedure 21(b). In the words of famed Chicago bluesman, Hound Dog Taylor, "Yeah, I'm gonna send you back to Georgia / Honey that's where you belong."[8]

---

[8]    HOUND DOG TAYLOR & THE HOUSE ROCKERS, *Gonna Send You Back to Georgia, on* GENUINE HOUSEROCKING MUSIC (Alligator Records 1982).

Therefore, the Undersigned **grants** the reconsideration motion, **transfers** this case to the Northern District of Georgia and **directs** the Clerk to take the administrative steps necessary to transfer this case to the Northern District of Georgia.

**DONE and ORDERED** in Chambers, in Miami, Florida, on April 24, 2017.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to**</u>:
The Honorable Jose E. Martinez
All counsel of record